**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3662-13T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

    Plaintiff-Respondent,

v.

K.M.,

    Defendant-Appellant.

_____

IN THE MATTER OF G.G.,
a minor.

_____

<table>
<tr><td>APPROVED FOR PUBLICATION<br><br>February 25, 2016<br><br>APPELLATE DIVISION</td></tr>
</table>

Argued November 12, 2015 - Decided February 25, 2016

Before Judges Fuentes, Koblitz and Gilson.

On appeal from Superior Court of New Jersey,
Chancery Division, Family Part, Middlesex
County, Docket No. FN-12-65-14.

Clara S. Licata, Designated Counsel, argued
the cause for appellant (Joseph E. Krakora,
Public Defender, attorney; Ms. Licata, on
the brief).

James F. LaFargue, Deputy Attorney General,
argued the cause for respondent (John J.
Hoffman, Acting Attorney General, attorney;
Melissa Dutton Schaffer, Assistant Attorney
General, of counsel; Mr. LaFargue, on the
brief).

Danielle Ruiz, Designated Counsel, argued
the cause for minor G.G. (Joseph E. Krakora,

Public Defender, Law Guardian, attorney; Ms.
Ruiz, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

Defendant K.M.[1] is the biological mother of G.G., a boy born in April 2013.  She appeals from the order entered by the Family Part finding she abused or neglected G.G. within the meaning of N.J.S.A. 9:6-8.21(c)(4)(a), after the child was born manifesting signs of physical distress caused by withdrawal from opioid addiction.  We affirm.

G.G. was born at St. Peter's University Hospital in New Brunswick weighing 9 pounds and 3.6 ounces, and showing no apparent signs of distress or abnormalities.  However, during the first three days after his birth, the medical staff noted the infant was exhibiting symptoms consistent with opioid withdrawal.  G.G. was thereafter admitted to the neonatal intensive care unit (NICU) for respiratory distress.  The hospital staff contacted the Division of Child Protection and Permanency (Division), which dispatched a caseworker to meet and discuss the situation with defendant.

---

[1] We use initials and fictitious names to protect the confidentiality of the participants in these proceedings pursuant to Rule 1:38-3(d).

Upon arriving at the hospital, the Division caseworker saw G.G. at the NICU before meeting with defendant. The caseworker noted G.G. was "jerking his arm up above his head." By this time, the nursing staff was actively monitoring the infant for withdrawal symptoms. Defendant admitted to the caseworker she was addicted to oxycodone, sold as Roxicodone or "Roxis," prior to her pregnancy.[2] Defendant also admitted to illicitly acquiring Suboxone,[3] an opioid analog prescribed by physicians to treat the physical symptoms of opioid withdrawal. She told the caseworker she ingested Suboxone two to three times per week and smoked marijuana during her pregnancy.

The NICU medical staff began treating G.G. with morphine after learning defendant's history of opioid addiction, including her efforts to self-medicate the symptoms of withdrawal by using Suboxone during her pregnancy. G.G. spent a total of twenty-two days in the hospital to recover from the withdrawal symptoms. He was released to defendant and his biological father in late May 2013.

---

[2] K.M. testified the opioid-based prescription pain medication she took was not prescribed to her by a physician. She took the medication a physician prescribed for her friend to alleviate the pain the friend experienced from a knee injury.

[3] Suboxone is a controlled dangerous substance within the meaning of N.J.S.A. 2C:35-2, and can be acquired legally in a pharmacy only with a prescription from a licensed physician.

On July 9, 2013, the Division filed an Order to Show Cause (OTSC) and a Verified Complaint against defendant in the Family Part pursuant to N.J.S.A. 30:4C-12, seeking legal custody of G.G. and responsibility for his physical welfare and supervision. That same day the Division amended the complaint to charge defendant with abuse or neglect of G.G. under N.J.S.A. 9:6-8.21(c)(4). The Family Part granted the Division's request and scheduled the return date for the OTSC for August 12, 2013.

By the time the case returned to the court, defendant had completed substance abuse counseling and had attended supervised visitation with G.G., who was by then cleared of any medical issues related to his opioid withdrawal. The court conducted fact-finding hearings on December 9, 2013, January 29, 2014, February 18, 2014, and February 24, 2014. The evidence presented at these hearings established that defendant became addicted to oxycodone approximately four years before she gave birth to G.G. in 2013. She began taking her friend's prescription pain medication to alleviate the pain caused by a sprained ankle she suffered while playing college sports. She continue to ingest this medication in pill form multiple times a week until she realized she was pregnant in October 2012.

While pregnant, defendant came to the realization that continuing to abuse these drugs would be detrimental to the

welfare of the fetus. Based on the research she conducted online, K.M. discovered that abruptly stopping the use of this opioid analgesic could cause a miscarriage. She also learned about the opioid analog Suboxone, that, according to defendant, physicians prescribed to pregnant women to help with withdrawal symptoms. However, instead of consulting a physician to confirm Suboxone was safe to take while pregnant and thereafter obtain a prescription for the medication, defendant again decided to self-medicate by obtaining the drug from a friend. She thereafter continued to use Suboxone throughout her pregnancy and made the conscious decision not to disclose she was taking this medication to her obstetrician.

Defendant called Dr. Loretta P. Finnegan as an expert witness. The Family Part admitted Dr. Finnegan as an expert in "pediatrics and with a specialty in the area of neonatology and specifically prenatal addiction and neonatal abstinence syndrome." Based on a 2010 study in the New England Journal of Medicine which "compared the effects methadone versus Buprenorphine" (the generic term for Suboxone),[4] Dr. Finnegan testified the study found "both medications were appropriate for pregnant women."

---

[4] Hendrée E. Jones et al., <u>Neonatal Abstinence Syndrome After Methadone or Buprenorphine Exposure</u>, 363 <u>New Eng. J. of Med.</u> 2320 (2010).

According to Dr. Finnegan, babies who are born after their mothers have ingested Suboxone during pregnancy are closely monitored every four hours after birth to determine the extent of any withdrawals symptoms. Medical staff assess the severity of the withdrawals using a twenty-one point score. The visual symptoms include jerking, sneezing, loose stools, sucking, hypertonia and tremors. Because defendant did not disclose she took Suboxone to the medical staff who attended to her during G.G.'s delivery, there was a three-day delay in the start of treatment to alleviate the baby's withdrawal symptoms.

Dr. Finnegan testified that Suboxone is an appropriate medication to administer to pregnant women withdrawing from opioids. In her report, Dr. Finnegan opined that G.G.'s withdrawal symptoms could have been exacerbated by the hospital's course of treatment. Dr. Finnegan also stated in her report that while "urine toxicology studies of G.G. did not verify opioids were detected . . . one can deduce that there was a passive transfer of opioids from the mother's blood circulation to her fetus during pregnancy." When asked if G.G. suffered from withdrawal from the drugs he was exposed to in utero, Dr. Finnegan responded: "Yes."

Dr. Finnegan equated the symptoms G.G. experienced with neonatal abstinence syndrome (NAS). The fact that the infant's

symptoms subsided when the medical staff began morphine treatment establishes G.G. was suffering from NAS. When asked to opine whether G.G. suffered harm after birth, Dr. Finnegan responded:

> If you take harm in the strict sense of the definition, it would mean that this baby had some physical problem. The baby obviously had a withdrawal. So, in the strict sense of the word, you would say yes. However, withdrawal is basically a side effect of medication. The mother took medication that's legally used in the medical community for the treatment of opioid addiction.

Based on these uncontested facts, the Family Part judge concluded defendant had abused or neglected G.G. within the meaning of N.J.S.A. 9:6-8.21(c)(4)(a). The judge stated her reasons in an oral opinion delivered from the bench at the conclusion of the fact-finding hearing.

> [Defendant] was addicted to Roxis and found she was pregnant. She did not go to a doctor at that point. She did research online on Suboxone so she wouldn't have withdrawals. I never heard it anywhere, other then [sic] Dr. Finnigan's report, that that was for her baby. In fact I got the impression even from her it was for her own withdrawal. She took it a couple of times a week and indicated she never got a prescription but she got it [from] friends. We don't know how much she was taking. We don't know what type - - if a drug is bought off the street, we certainly don't know the potency of it. We don't know if it's been laced with something else, and basically that was a very big risk for mom to take. We have no information, we just know that

she bought it off the streets or her friends.

She never sought assistance from a pain management doctor. She never told her prenatal doctor. Never told the father of the child, just continued to take the drug during her entire pregnancy. And the fact that she did not believe it was a drug, I don't find credible. She knew it was illegal to take this, and frankly she indicated she was scared that they would take her baby. She continued to do without being monitored by a doctor throughout her pregnancy, and I find that clearly is a failure to provide a minimum degree of care. . . . Also I think it's important to note, that even when she was in the hospital and questioned by the caseworker she continued to say that she was not taking any drugs or using any drugs.

In this appeal, defendant argues the record does not show G.G. suffered actual physical, mental, or emotional harm due to defendant's ingestion of Suboxone during her pregnancy. We agree with defendant in this limited respect. However, the question is not whether defendant ingested Suboxone during her pregnancy or even that she did so clandestinely, without disclosing it to her obstetrician. Defendant caused harm to G.G. when she waited three days after delivering G.G. to disclose to the neonatal staff that she had taken Suboxone. Her failure to act in a more timely manner caused her infant son needless suffering.

The analysis in an abuse or neglect case should "focus on the harm to the child and whether that harm could have been prevented had the guardian performed some act to remedy the situation or remove the danger."  G.S. v. Dep't of Human Servs., 157 N.J. 161, 182 (1999).  Under N.J.S.A. 9:6-8.21(c)(4) an "abused or neglected child" is

> a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, <u>medical</u> or surgical care though financially able to do so or though offered financial or other reasonable means to do so[.]
>
> [(Emphasis added).]

In <u>Department of Children & Families v. T.B.</u>, 207 N.J. 294, 306 (2011) (quoting N.J.S.A. 9:6-8.21(c)(4)), the Supreme Court held that in order to find abuse or neglect the parent must fail "to exercise a minimum degree of care."   The Court has defined "minimum degree of care" as denoting

> a lesser burden on the actor than a duty of ordinary care.  If a lesser measure of care is required of an actor, then something more than ordinary negligence is required to hold the actor liable.  The most logical higher measure of neglect is found in conduct that is grossly negligent because it is willful or wanton.  Therefore, we believe the phrase "minimum degree of care" refers to conduct that is grossly or wantonly negligent, but not necessarily intentional.

A-3662-13T3

> [G.S., supra, 157 N.J. at 178 (quoting
> N.J.S.A. 9:6-8.21(c)(4)).]

In New Jersey Division of Child Protection & Permanency v. Y.N., 220 N.J. 165, 183, 187 (2014), the Supreme Court reversed this court's decision finding a mother "violated the abuse and neglect statute solely because her newborn suffered neonatal abstinence syndrome as a result of her participation in a medically prescribed methadone maintenance treatment program." In sharp contrast to the uncontested facts here, the defendant in Y.N. "followed the advice of a medical professional and later entered into a methadone maintenance program." Id. at 184.

Mindful of the public policy implications of discouraging opioid addicted pregnant women from seeking informed medical advice if they were held liable for abuse or neglect under Title 9 after their children are born, the Court in Y.N. held:

> N.J.S.A. 9:6-8.21(c)(4)(b) does not require a finding of abuse or neglect when an addicted woman, who learns that she is pregnant, seeks timely professional treatment for her addiction that will improve the outcome for her unborn child. We hold that, absent exceptional circumstances, a finding of abuse or neglect cannot be sustained based solely on a newborn's enduring methadone withdrawal following a mother's timely participation in a bona fide treatment program prescribed by a licensed healthcare professional to whom she has made full disclosure.
>
> [Id. at 185-86 (emphasis added).]

Here, we are satisfied defendant's conduct rises to the level of grossly negligent as defined in G.S., supra, 157 N.J. at 178, and as a consequence, we find that she committed an act of neglect against G.G. under N.J.S.A. 9:6-8.21(c)(4)(a). Although we recognize a mother's physical and emotional stress after childbirth, see A.H.W. v. G.H.B., 339 N.J. Super. 495, 504 (Ch. Div. 2000), defendant was obligated to disclose the known necessary information to avoid endangering the health of her newborn child. Defendant willfully withheld the timely disclosure of key medical information about medication she was taking during her pregnancy that could have prevented three days of needless suffering to her infant son. We emphasize that defendant's decision to illicitly obtain Suboxone and thereafter ingest the medication to treat her withdrawal symptoms without consulting a physician do not bear any resemblance to the prudent, medically sound course of action employed by the defendant in Y.N. See Y.N., supra, 220 N.J. at 169-72, 184.

At this point, we must pause to make clear our disagreement with the trial court's analysis in one respect. The Family Part's analysis focused on defendant's conduct during her pregnancy. Specifically, the court noted defendant "never sought assistance from a pain management doctor. She never told her prenatal doctor. Never told the father of the child, just

continued to take the drug during her entire pregnancy." There is no evidence in the record that this aspect of defendant's conduct harmed G.G. in any way.

Defendant neglected her infant son within the meaning of N.J.S.A. 9:6-8.21(c)(4)(a) when she failed to disclose in a timely manner her use of Suboxone to the neonatal staff after G.G. was born. If defendant had disclosed this information in a timely fashion, the neonatal staff could have begun monitoring G.G.'s condition in the manner consistent with Dr. Finnegan's testimony and intervene with morphine treatment or other forms of pharmacological treatment as the child's needs warranted. The three days G.G. suffered with withdrawal symptoms could have been avoided.

However, our disagreement with the trial court's analysis in this respect is legally inconsequential. It is a long settled principle of appellate jurisprudence that "an appeal is taken from a trial court's ruling rather than reasons for the ruling." State v. Adubato, 420 N.J. Super. 167, 176 (App. Div. 2011), certif. denied, 209 N.J. 430 (2012). We may affirm the final judgment of the trial court "on grounds other than those upon which the trial court relied." Ibid.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION