# **RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5426-15T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

A.S.,

    Defendant-Appellant,

and

S.R.,

    Defendant.

_____

IN THE MATTER OF R.R., a Minor.

_____

        Submitted March 22, 2018 — Decided August 13, 2018

        Before Judges Rothstadt and Gooden Brown.

        On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FN-12-0227-15.

        Joseph E. Krakora, Public Defender, attorney for appellant (Lora B. Glick, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Christina A. Duclos, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Lisa M. Black, Designated Counsel, on the brief).

PER CURIAM

Defendant A.S.[1] appeals from the Family Part's December 8, 2015 order. Following a fact-finding hearing, the trial court determined that defendant abused or neglected her infant son, R.R., within the meaning of N.J.S.A. 9:6-8.21(c)(4)(b), by using prescription medications during her pregnancy, which resulted in R.R. suffering withdrawal symptoms at birth.[2] On appeal, defendant argues the Division of Child Protection and Permanency (Division) failed to establish by a preponderance of the evidence that she failed to exercise a minimum degree of care in connection with her use of prescription medications during her pregnancy, and the trial court's finding to the contrary was erroneous. Based on our review of the record and the applicable legal principles, we agree and reverse.

---

[1] We use initials to protect the confidentiality of the participants in these proceedings pursuant to Rule 1:38-3(d).

[2] There was no finding against S.R., R.R.'s biological father.

A-5426-15T3

We glean the following facts from the record developed over the course of the two-day fact-finding hearing, during which the Division presented a single witness, Tara Cannon, a Division intake worker. The court also admitted numerous documentary exhibits into evidence, including Cannon's investigation summary, defendant's medical records, and records from JFK Medical Center where R.R. was born. The circumstances leading to the Title Nine litigation began on February 19, 2015, when Cannon received a referral from a social worker at JFK Medical Center alleging that R.R. and defendant tested positive for benzodiazepine two days after R.R.'s birth. In response to these allegations, the Division executed an emergency removal of R.R., pursuant to N.J.S.A. 9:6-8.29[3] and 9:6-8.30, and later filed a verified complaint for custody, care, and supervision of R.R., pursuant to N.J.S.A. 9:6-8.21 and 30:4C-12.

Cannon testified that after speaking to the hospital social worker, she visited R.R. in the neonatal unit of the hospital and spoke with defendant about her prenatal drug use. Defendant told Cannon she had been prescribed several pain medications for a previous car accident, including oxymorphone, oxycodone, Soma, and

---

[3] N.J.S.A. 9:6-8.29 permits the emergency removal of a child from the parent's custody without a court order.

Naproxen. Defendant was also taking Xanax, a benzodiazepine, for anxiety, and Adderall, an amphetamine, for ADHD.[4] Defendant told Cannon that her pain management doctor, Dr. Manoj Patharkar, was unaware of her pregnancy. Defendant also informed Cannon that Dr. Charles M. Fleisch, her obstetrician/gynecologist (OB/GYN), was aware that she was taking the medications prescribed by Patharkar, and he "was weaning her off" of them. Cannon obtained defendant's medical records from Partharkar and Fleisch as well as her medical records from Doctors Medi Center, where she was treated for respiratory issues. Additionally, Cannon obtained the hospital records for R.R.'s birth.

Patharkar's records confirmed that defendant had not informed him of her pregnancy prior to R.R.'s birth. Fleisch's records revealed that defendant began prenatal treatment with him as early as July 24, 2014, which would have been in the first trimester of her pregnancy.[5] The records further revealed that defendant underwent two drug screenings while under Fleisch's care: the

---

[4] Defendant also told Cannon that she was prescribed medication for bipolar disorder, but she had "stopped taking [the] medication because she was pregnant" and was not under the care of a psychiatrist at the time.

[5] Cannon also obtained a letter from Fleisch summarizing his treatment of defendant. However, the court sustained defense counsel's objection to its admission into evidence, ruling that the letter was written "in regard to potential litigation and was not really a business record." See N.J.R.E. 803(c)(6).

first, a urine specimen collected about a month before R.R.'s birth, on January 22, 2015, and reported on January 29, 2015; the second, a whole blood specimen, collected twenty days before R.R.'s birth, on February 5, 2015, and reported on February 19, 2015. The first report revealed that defendant tested positive for both amphetamines and opiates, but negative for benzodiazepines. On the first page of the first report, there were two handwritten notes, one stating that "she stopped all pain meds last week," and the other stating "pain Dr." and "Parthakar," along with a phone number. The second report revealed that defendant's blood tested positive for oxycodone but negative for opiates, amphetamines, and "Oxycodone, Unconjugated." Upon admission to JFK Medical Center for R.R.'s delivery on February 17, 2015, defendant tested positive for Xanax, but negative for amphetamines and opiates.

Hospital records revealed that R.R.'s meconium, or first stool, tested positive for oxymorphone and benzodiazepine. R.R. was placed on morphine for withdrawal symptoms associated with neonatal abstinence syndrome (NAS). His withdrawal symptoms included uncontrollable sucking, difficulty breathing, poor weight gain, and frequent stirring. R.R. remained in the neonatal intensive care unit for twenty-four days before being discharged on March 11, 2015.

Following the fact-finding hearing, the court issued an oral decision on December 8, 2015, finding that defendant had failed to exercise a minimum degree of care and unreasonably inflicted harm on R.R. The court found Cannon to be "a credible witness," remarking that "[s]he was clear and concise, . . . recalled events," and was not evasive in answering questions. Next, relying on N.J.S.A. 9:6-8.21(c)(4)(b) and New Jersey Division of Child Protection & Permanency v. Y.N., 220 N.J. 165 (2014), the court noted that "[t]he statute makes very clear that . . . parental fault is an essential element of a finding of abuse or neglect" and "does not suggest that a finding of abuse or neglect can be premised solely on . . . harm caused to a child without consideration of the reasonableness of the parents' conduct."

Turning to the facts of the case, the court determined that "there was clearly evidence of harm in the sense that the child was positive for . . . benzo[diazepine], as well as opiates" and "had to be treated with morphine by hospital personnel." The court further found "that there was respiratory distress, there [were] concerns with the child's ability to swallow and to suck[,] and the child remained in the hospital for three weeks and had to be weaned off the morphine that was treating the withdrawal symptoms."

A-5426-15T3

In considering parental fault, the court acknowledged that defendant "was seeing her pain management doctor" and was prescribed each of her medications. The court also credited defendant for seeing an OB/GYN who "was aware of the drugs that she was taking" and who had instructed her to "lower her Oxycodone, [and] stop the Xanax." However, according to the court:

> [Defendant] [told] the caseworker that Dr. Fleisch [was] weaning her off. [There was] no information that Dr. Fleisch [was] weaning her off anywhere. [There was] no proof in his record indicating that, other than the information where she should lower her Oxy[codone] and stop Xanax. Nowhere [did] he say [he was] weaning her off and, again, [he was] not prescribing them, Patharkar [was] and [Patharkar] [did not] even know [she was] pregnant and he certainly [was not] weaning her off because he didn't know she was pregnant . . . , so [he was] not monitoring her and the baby. . . . Fleisch appear[ed] to be thinking that her pain management doctor may [have been] . . . doing that but [defendant] [did not] seek medical help for her and her child. She [did not] enter a treatment that would address her and her child's needs. She [did not] consult the doctor and give a full disclosure of her circumstances. She just continue[d] with her pain management doctor getting the medications for her pain without telling him [she was] pregnant and she [went] over to the OB/GYN and [said], oh, yeah, I'm getting these prescriptions and [Fleisch] [made] recommendations that she should lower certain things but she [did not] do it, and neither one of them [had] any contact with each other . . . .

Based on this assessment, the court distinguished <u>Y.N.</u>, and concluded that defendant failed to exercise the requisite minimum degree of care. The court explained:

> In this case, Patharkar didn't know she was pregnant. So, between not telling Patharkar that and not being completely upfront, I believe, with the caseworker that Dr. Fleisch was weaning her off, those are two very big concerns the [c]ourt has. [Defendant] wasn't giving full disclosure, very different from the case in <u>Y.N.</u> She failed to exercise a minimum degree of care by not disclosing the information to Dr. Patharkar and continuing to take all of her medications and unreasonably inflicting harm on this child. This is not <u>Y.N.</u> where a parent may cause injury to a child to protect that child from greater harm. She didn't do what the woman in <u>Y.N.</u> did. She continued taking her medications without telling the doctor so there was a lack of full disclosure and she was pregnant during that time. So, there was no treatment program weaning her off, there was no full disclosure and this [c]ourt finds by a preponderance of evidence that she failed to exercise a minimum degree of care and unreasonably inflicted the harm on the child.

The court entered a memorializing order to that effect, and later entered an order on July 8, 2016, terminating the litigation. This appeal followed.

On appeal, defendant argues that "[t]he court's findings are not supported by the evidence and are based on an improper legal standard" because she "secured timely prenatal care and followed the recommendations of her [OB/GYN], Dr. Fleisch," "to whom she

had made full disclosure." Although defendant passingly notes that "expert testimony may have been helpful to establish harm" to R.R., she acknowledges that the records of R.R.'s hospitalization in the neonatal intensive care unit for morphine withdrawal symptoms constituted sufficient evidence of harm. However, defendant argues the "court misinterpreted the holding in Y.N. to find that [she] failed to exercise the minimum degree of care and unreasonably caused harm to her newborn" by "focus[ing] on evidence of harm to the child while ignoring the lack of evidence of parental fault." We agree.

We accord deference to the Family Part's fact-finding in part because of the court's "special jurisdiction and expertise in family matters." Cesare v. Cesare, 154 N.J. 394, 413 (1998). We will uphold the trial court's fact finding if supported by sufficient, substantial, and credible evidence in the record because the judge has had the opportunity to observe witnesses, weigh their credibility, and develop a "'feel' of the case." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279, 293 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). However, we will not hesitate to set aside a ruling that is "so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 38 (2011) (quoting M.M., 189 N.J. at 279) (reversing a court's "medical neglect"

finding for lack of sufficient evidential support).  We also accord no deference to the trial court's "interpretation of the law and the legal consequences that flow from established facts." Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Under N.J.S.A. 9:6-8.21(c)(4)(b), to establish "abuse or neglect," the Division bears the burden of proving by a preponderance of the competent, material, and relevant evidence that a parent: 1) failed to exercise a "minimum degree of care" and (2) "unreasonably inflict[ed] or allow[ed] to be inflicted harm, or substantial risk thereof."  Y.N., 220 N.J. at 178-80 (quoting N.J.S.A. 9:6-8.21(c)(4)(b)).  Thus, "[t]he statute makes clear that parental fault is an essential element for a finding of abuse or neglect under N.J.S.A. 9:6-8.21(c)(4)(b)." Y.N., 220 N.J. at 180.

Our Supreme Court has defined the phrase "minimum degree of care" as:

> a lesser burden on the actor than a duty of ordinary care.  If a lesser measure of care is required of an actor, then something more than ordinary negligence is required to hold the actor liable.  The most logical higher measure of neglect is found in conduct that is grossly negligent because it is willful or wanton.  Therefore, . . . the phrase "minimum degree of care" refers to conduct that is grossly or wantonly negligent, but not necessarily intentional.

10

[G.S. v. N.J. Div. of Youth & Family Servs., 157 N.J. 161, 178 (1999).]

"Conduct is considered willful or wanton if done with the knowledge that injury is likely to, or probably will, result." Ibid. "Because risks that are recklessly incurred are not considered unforeseen perils or accidents in the eyes of the law, actions taken with reckless disregard for the consequences also may be wanton or willful." Ibid. Even if the parent is unaware of the "highly dangerous character of her conduct," if "the act or omission that causes the injury is done intentionally . . . , [k]nowledge will be imputed to the actor," and the parent will be liable. Ibid.

In connection with prenatal drug use, although the abuse and neglect statute "is limited to the condition of a child after birth," the "behavior of an expectant mother during pregnancy can still be relevant if it relates to a child's suffering or the risk of harm to a child after birth." N.J. Div. of Youth & Family Servs. v. A.L., 213 N.J. 1, 22 (2013). Although "not every instance of drug use by a parent during pregnancy, standing alone, will substantiate a finding of abuse and neglect," id. at 23, "[i]f an expectant mother's drug use causes actual harm to the physical, mental, or emotional condition of a newborn child, a finding of abuse or neglect is appropriate." Id. at 8. "[P]roof

11                                                    A-5426-15T3

that a child is suffering from withdrawal symptoms at birth could establish actual harm." Id. at 22.

In Y.N., 220 N.J. at 183, the Court was tasked with determining whether a mother committed abuse or neglect where her newborn "suffered [NAS] as a result of her participation in a medically prescribed methadone maintenance treatment program." In making its decision, the Court took note of the "perverse disincentive" of holding a woman liable for obtaining "timely medical advice" in an attempt to reduce the potential harms facing her child. Id. at 184. Thus, the Court held:

> N.J.S.A. 9:6-8.21(c)(4)(b) does not require a finding of abuse or neglect when an addicted woman, who learns that she is pregnant, seeks timely professional treatment for her addiction that will improve the outcome for her unborn child. We hold that, absent exceptional circumstances, a finding of abuse or neglect cannot be sustained based solely on a newborn's enduring methadone withdrawal following a mother's timely participation in a bona fide treatment program prescribed by a licensed healthcare professional to whom she has made full disclosure.

> [Id. at 185-86.]

In contrast, in New Jersey Division of Child Protection & Permanency v. K.M., 444 N.J. Super. 325, 331-32 (App. Div. 2016), we upheld a finding of neglect under N.J.S.A. 9:6-8.21(c)(4)(a) where, for three days, a mother failed to disclose to neonatal staff at the hospital where her child was born that she had taken

12

Suboxone during her pregnancy without a prescription. Finding that defendant's conduct rose to the level of grossly negligent as defined in G.S., 157 N.J. at 178, we determined:

> defendant was obligated to disclose the known necessary information to avoid endangering the health of her newborn child. Defendant willfully withheld the timely disclosure of key medical information about medication she was taking during her pregnancy that could have prevented three days of needless suffering to her infant son. We emphasize that defendant's decision to illicitly obtain Suboxone and thereafter ingest the medication to treat her withdrawal symptoms without consulting a physician do not bear any resemblance to the prudent, medically sound course of action employed by the defendant in Y.N.

[K.M., 444 N.J. Super. at 333.]

Applying these principles, we are persuaded that the Division's proofs fell short under the circumstances presented in this case. Although Cannon introduced defendant's medical records, she offered no testimony interpreting or explaining the contents of those records, nor did she testify from personal knowledge about defendant's prenatal care. Therefore, to the extent that the court's finding of parental fault was based on its interpretation of defendant's medical records rather than testimony, we accord no special deference to those findings. "Instead of filling in missing information, an understandable response by judges who regularly witness the evils inflicted on

children by their parents' drug use, judges must engage in a fact-sensitive analysis turning on 'particularized evidence.'" <u>N.J. Div. of Child Prot. & Permanency v. R.W.</u>, 438 N.J. Super. 462, 470 (App. Div. 2014) (quoting <u>A.L.</u>, 213 N.J. at 28).

In its findings, the court relied on the two drug test results culled from Fleisch's medical records to conclude that defendant disregarded Fleisch's recommendation to lower her ingestion of pain medications. Despite the court's certitude, in the absence of testimony, the record is unclear about when or to what extent Fleisch directed defendant to reduce her ingestion of prescription medications and is, at best, inconclusive regarding whether or not defendant followed Fleisch's directive. Although the drug tests revealed the presence of amphetamines and opiates, by the time defendant was admitted to JFK Medical Center for R.R.'s delivery about a month later, defendant's drug screen was positive only for benzodiazepine and negative for amphetamines and opiates. This was consistent with the handwritten note appearing on the report of the January 22, 2015 drug screen, indicating that defendant had "stopped all pain meds last week." Defendant was taking Xanax, a benzodiazepine, that was prescribed for her anxiety, not pain.

In the absence of expert testimony to explain and interpret the results, the court should not have intuited the meaning of the test results on its own. <u>See</u> <u>Mullarney v. Bd. of Review</u>, 343 N.J.

14 <span>A-5426-15T3</span>

Super. 401, 408 (App. Div. 2001) (holding defendant's argument was "so esoteric that a fact-finder of common judgment and experience cannot [form a] valid judgment on the contention without the assistance of expert testimony"). Undoubtedly, the record shows that defendant used prescription pain medications during her pregnancy, which led to R.R. suffering harm after his birth. However, the record also shows that defendant attempted to avoid this harm by obtaining prenatal care early in her pregnancy, disclosing her prescribed medications to her OB/GYN, and, at least to some degree, following his recommendation that she reduce her intake of those drugs. Although defendant did not disclose her pregnancy to Patharkar, who prescribed the pain medications, she took prescription pain medications in accordance with legitimate medical advice.

Because defendant obtained prenatal care from a licensed healthcare professional to whom she made full disclosure, and there was no evidence that defendant took drugs other than those duly prescribed by a licensed medical practitioner, we conclude that defendant is more akin to the mother in Y.N., 220 N.J. at 168, than the mother in K.M., 444 N.J. Super. at 331. We recognize that the medications were not prescribed under the auspices of a bona fide treatment program to combat a prenatal drug addiction, as was the methadone in Y.N., 220 N.J. at 168. However, Fleisch

was a licensed healthcare professional from whom defendant obtained prenatal care and to whom defendant made full disclosure about her ingestion of prescribed medications and, at least to some degree, followed his recommendation that she reduce her intake of those drugs. Defendant may have been negligent in complying with Fleisch's directive, but the record does not support a finding of gross negligence constituting a failure to exercise a minimum degree of care as defined in G.S., 157 N.J. at 178. Thus, the court's conclusion that defendant committed abuse and neglect was "wide of the mark," M.M., 189 N.J. at 279, and not sustainable.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5426-15T3