# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."  Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited.  R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3849-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

A.S.,[1]

     Defendant-Appellant,

and

A.S.,

     Defendant.

_____

IN THE MATTER OF R.R.S.S.,
a minor.

_____

Submitted May 19, 2021 – Decided December 9, 2021

---

[1]  Pursuant to Rule 1:38-3(d)(12), we use initials or pseudonyms to protect the parties' privacy and preserve the confidentiality of these proceedings in accordance with Rule 5:12-1 to -7.

Before Judges Fuentes and Rose.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FN-09-0274-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Carol L. Widemon, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Amy Melissa Young, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Dana Citron, Designated Counsel, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

Defendant A.S. is the biological mother of R.R.S.S. (Renee), a baby girl born in March 2019. A.S. appeals from an order entered by the Family Part that found she abused and neglected her infant daughter, as defined in N.J.S.A. 9:6-8.21(c)(4)(b), by continuing to use heroin, benzodiazepines, and cannabis throughout her pregnancy, and failing to take medically reasonable measures to treat her addiction. The Family Part judge who presided over this case found defendant's failure to take any prophylactic measures resulted in Renee suffering

2

withdrawal symptoms and ultimately being diagnosed with neonatal abstinence syndrome.

Against medical advice, defendant left the hospital the day after giving birth to Renee, abandoning her medically compromised infant daughter. Days later, Renee was transferred to the neonatal intensive care unit (NICU).

In this appeal, defendant argues the Family Part judge erred as a matter of law because the Division of Child Protection and Permanency (Division) failed to prove, by a preponderance of the evidence, that she abused and neglected her daughter within the meaning of N.J.S.A. 9:6-8.21(c)(4)(b). Specifically, defendant argues the Division failed to prove, by a preponderance of the evidence, she caused Renee actual harm or placed her in imminent risk of substantial harm.

We reject these arguments and affirm. We gather the following facts from the record developed before Judge Radames Velazquez, Jr., and the specific findings he made based on the evidence presented by the Division at the fact-finding hearing held on August 23, 2019.

I.

The day after Renee was born, Jersey City Medical Center (JCMC) social worker Nancy Floom reported to the Division "allegations of neglect,

abandonment[,] and [a] substance affected newborn." Division intake caseworker Linda Arias responded to the referral from JCMC. Floom informed Arias that defendant tested positive for opiates, benzodiazepines, and cannabis at the time she gave birth to Renee. The newborn tested positive for benzodiazepines and opiates. Arias learned defendant has "a history of [intravenous (IV)] heroin use" and ingested five to six bags of heroin the day she gave birth the Renee. Defendant did not have prenatal care throughout her pregnancy and left JCMC against medical advice and without making plans for Renee's care.[2]

At 12:10 p.m. on the same day defendant left JCMC, Division caseworkers Arias and Buddy P. Toribio visited defendant at her maternal aunt's residence in the City of Bayonne. At the time, the maternal aunt was ninety years old and had custody of defendant's other daughter. Division records of this encounter indicate defendant was "well groomed" and "coherent." Defendant told Arias she learned she was pregnant while incarcerated at the Hudson County

---

[2] According to Division records, defendant only provided a telephone number when she left JCMC without Renee. She did not provide an address where she could be found or inform the medical staff of her plans with respect to her infant daughter. The record specifically noted defendant "did not say she wanted to leave her child under [the New Jersey Safe Haven Infant Protection Act, N.J.S.A. 30:4C-15.5 to -15.11]."

Correctional Facility (HCCF) in August 2018.  She attempted to "wean off" heroin with methadone, but her abstinence lasted only three weeks.

The day after her birth, JCMC transferred Renee to the NICU because she was "presenting severe withdrawal symptoms."  From March 19 to March 30, 2019, Renee "was given [a] neonatal morphine solution for withdrawal treatment."  After a brief pause, the morphine solution treatments resumed on March 31, 2019, when Renee manifested serious withdrawal symptoms.  "She was irritable, with high temperature and unable to sleep.  She had tremors when awake and [her] feeding [was] uncoordinated."  The second round of morphine treatment lasted from March 31 until April 4, 2019.

On April 9, 2019, JCMC medically discharged Renee.  On that same date, the Division executed a Dodd[3] removal and placed Renee at a Division Resource Home.  The Division filed an Order to Show Cause on April 11, 2019, before Judge Velazquez.  Defendant was present and represented by counsel through the Office of the Public Defender, and counsel assigned by the Office of the Law Guardian appeared on behalf of Renee.

---

[3] "A 'Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82." N.J. Div. of Youth & Fam. Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010).

A-3849-19

The Deputy Attorney General (DAG) who appeared on behalf of the Division represented to Judge Velazquez that Renee's alleged biological father[4] was not a suitable placement for this medically fragile infant. He also declined to appear in court because he has a criminal record that includes possession of illicit narcotics to support his addiction, burglary, robbery, and violation of probation. He also resides in a basement apartment that, by his own admission, is not suitable to accommodate Renee's care and medical needs.

The DAG petitioned the court to grant the Division legal custody of Renee and to direct the child's biological parents to undergo drug screening, and thereafter comply with any recommended treatment plan. The Division also asked the court to order both biological parents to undergo psychological evaluations, and defendant to undergo a psychiatric evaluation. Finally, the Division asked the court not to permit either parent unsupervised visitation with the child.

After considering the arguments and concerns raised by counsel on behalf of all parties, Judge Velazquez found the emergent removal of the child "was

---

[4] The man identified as Renee's biological father initially disputed paternity. The Division thus requested the court to order a paternity test to settle the matter; a DNA test confirmed he is Renee's father. Although this man was a party in this case before the Family Part, he is not part of this appeal.

necessary to avoid an ongoing risk to [her] life, safety and health." The judge found defendant unsuitable to assume any parental responsibilities at the time because she was "incarcerated for her failure to comply with the requirements of her drug court program."[5] Finally, Judge Velazquez found Renee's removal was required "due to the imminent danger to the child's safety, health or welfare . . . ."

## II.

On August 23, 2019, Judge Velazquez conducted the fact-finding hearing required under N.J.S.A. 9:6-8.44 to determine whether Renee had been abused or neglected. In addition to the records documenting the investigation of the child's birth and defendant's history of drug addiction, the Division presented the testimony of eight witnesses: neonatologist Dr. Sadia Razi, defendant's probation officer, the supervisor of the Bayonne Community Mental Health Center (BCMH), two family members, and three Division caseworkers. Defendant did not call any witnesses nor testify in her own defense.

---

[5] Defendant was convicted of fourth degree theft by unlawful taking, N.J.S.A. 2C:20-3(a). On February 15, 2019, she was sentenced to Drug Court Probation, set to expire on December 14, 2023. As a condition of her probation, defendant was required to successfully complete the Hudson County Drug Court Program. On April 9, 2019, defendant was arrested during her Drug Court hearing on an open warrant.

7

In his opening statement, defendant's counsel framed the Division's burden of proof in this case as follows:

> Your Honor, it appears that the moving party is making something simple into something complex. The case would revolve around whether the Division can prove withdrawal occurred at the time of birth, not whether an individual was suffering from addiction or exercise[d] the degree of harm because of being an addict.
>
> . . . .
>
> All I'm saying is the case is simple. Can they prove withdrawal or can they not and that's it. That's all that matters in a case like this.

The Division's first witness was Dr. Sadia Razi, board certified in pediatrics and neonatology. According to Dr. Razi, "[a] neonatologist is an intensive care physician who take[s] care of the infants who are either premature or babies who are sick, for example with infections, with respiratory distress, with drug withdrawal or other medical problems." The Division did not offer nor did Dr. Razi provide an expert report.

Defense counsel did not object to Dr. Razi's testifying in her capacity as Renee's treating physician including an explanation of her diagnosis of neonatal abstinence syndrome and withdrawal. However, the Law Guardian argued Dr. Razi needed "to be qualified as an expert in order to provide [this] testimony. . . . She was the treating physician for this child and the medical records that

A-3849-19

were admitted for this child are essentially the report." Judge Velazquez found Dr. Razi "certainly has the requisites to give testimony as an expert . . ." but warned the DAG not to go beyond "what [Dr. Razi's] role was in this particular case . . . ." The judge allowed Dr. Razi to express her opinions and explain her diagnosis of neonatal abstinence syndrome based on the facts in this case but emphasized "she's primarily here as a fact witness."

Dr. Razi explained drug withdrawal in newborns "is called neonatal abstinence syndrome." The infant is treated with morphine to ameliorate the withdrawal symptoms. Renee tested positive for opiates and benzodiazepine at birth. Renee was diagnosed with neonatal abstinence syndrome two days after her birth and was admitted and treated in the NICU for three weeks. In addition to morphine, Renee was placed in a dark place to avoid stimulation. According to Dr. Razi, infants with this syndrome "require [a] special type of physical therapy, occupational therapy, and speech therapy."

Hospital records previously admitted into evidence reflect that on March 31, 2019, Renee "was very irritable with [a] high temperature, unable to sleep, uncoordinated feeding, agitated, tremors when awake." Dr. Razi explained this indicated "the baby had [a] very high score of withdrawal." Based on her experience treating thirty to forty babies with neonatal abstinence syndrome,

9

Dr. Razi testified newborns who experience neonatal abstinence syndrome "can have poor neurological outcomes. . . . [T]hey can have [a] lower IQ than most . . . babies do. They can have . . . [attention-deficit/hyperactivity disorder (ADHD)], autism, or other type[s] of psychiatric problems like anxiety . . . learning disabilities or issues with their grade level."

The remaining witnesses called by the State focused primarily on defendant's personal life. For example, Omar Salas, BCMH's addiction and mental health services program supervisor, testified defendant's heroin addiction began when she was prescribed pain medication for an injury she suffered in a car accident. Division caseworker Linda Arias described how the investigation began from the referral received from the JCMC social worker and then resulted in Renee's removal. Arias also testified to defendant's admission of ingesting "five to six bags of heroin" the day she gave birth to Renee.

The Division also called Hudson County Drug Court probation officer Myriam Abreu-Borchert, who was assigned to defendant after she violated her probation. As a condition of her special probation, defendant was required to attend Drug Court sessions, report to her probation officer, and be monitored to detect any drug abuse. Abreu-Borchert testified defendant failed to comply with these requirements less than a month before Renee was born.

 A-3849-19

After considering the evidence presented, as well as the arguments of counsel, Judge Velazquez found it undisputed that defendant had a serious heroin addiction when she gave birth to Renee. The judge found defendant admitted on the day she gave birth to her daughter "she used approximately five to six bags of heroin . . . ." The judge referred to a particular JCMC medical record admitted into evidence, stating

> the child was seen having [a] quivering chin, a clenched jaw which is consistent with the testimony of Dr. Sadia Razi who said that the child ranked [nineteen] on a scale of approximately [twenty-one] to [twenty-two] being a very significant high rating for children suffering from withdrawal symptoms, requiring medication [and] three weeks hospitalization.

Based in large part on Dr. Razi's testimony, Judge Velazquez found the Division proved, by a preponderance of the evidence, it is "highly likely that in the future [Renee] will require additional services and additional medical care related to learning disabilities and neurological issues . . . ." Based on these findings, Judge Velazquez concluded the Division proved, by a preponderance of the evidence, defendant caused actual physical and neurological harm to her infant daughter by ingesting heroin during her pregnancy, up to and including the day she gave birth to Renee.

11

On September 17, 2019, less than a month after the fact-finding hearing, the Division learned defendant and Renee's biological father were arrested on September 11th and charged with burglary and theft. They were both detained in the HCCF. Division records noted "[b]oth parents admit to drug use up until their incarceration." Judge Velazquez conducted four compliance and review hearings over the next eight months. The Division arranged for Renee to visit her biological parents at the HCCF. But the room the prison provided for visits was not conducive to an infant's needs. The baby was not able to crawl around, and toys were not permitted. The visits were thus "cut short by the parents due to [Renee] being uncomfortable and inconsolable."

Judge Velazquez conducted a total of four review hearings from September 26, 2019, to May 7, 2020. Defendant was in a drug treatment program until she was discharged in March 2020 for fighting and distributing medication to other participants. The resource parents attended the permanency hearing held on March 5, 2020. The resource mother testified her family consisted of her husband, her sixteen-year-old son, and ten-year-old daughter. The resource mother also apprised Judge Velazquez of the progress Renee had made since she was placed in her home by the Division and her family's desire to adopt the child if reunification proved to be unwarranted.

When [Renee] entered our home [she was] seven weeks old. She was a frail little peanut that trembled occasionally from her withdrawal and she required lots of TLC. We instantly fell in love with her, the whole family did. We took all the necessary steps to get her on track, including early intervention and specialist appointments.

[Renee] currently attends the daycare with me and is in the baby room. She absolutely loves school. She loves seeing her friends and is known as the best cuddler in her class. Her teachers just adore her and spoil her partially because I'm their boss.[6] But [Renee] is smart, funny and a bundle of joy. She loves bath time, babbles up a storm, she loves to crawl around chasing the dog. She is getting ready to walk and constantly dumps the dog's bowl. She loves to do that after she's been just dressed.

She is a determined little girl and currently isn't a fan of the word no. Most of all [Renee] is happy and she is thriving. She continues to make progress in her environment and amazes us every[ ]day.

When we were asked to help and finally made the big decision to take her into our home[,] we never imagined the joy that she would bring us. Here, we thought we were blessing this child with a loving home when, in turn, she has really blessed us.

My husband and I want what is best for [Renee]. She deserves everything. We always want to be part of her life and continue to see her grow. With that being said, if reunification cannot be accomplished, we want to express our desire to adopt [Renee] and continue to love

---

[6] The resource mother testified she has been the director of an academic childcare center for the past nineteen years.

13

and care for her. Either way, we would like to be in her life. Thank you.

Judge Velazquez conducted the final permanency hearing telephonically on May 7, 2020, during the height of the COVID-19 pandemic. The DAG noted that since the last hearing, defendant had been discharged from the drug rehabilitation program at Integrity House for "distributing prescribed medication to other members of the program . . . [and] was also involved in a physical altercation." As result, she was no longer receiving any services for her addiction.

By contrast, the Division reported Renee remained in the physical custody of the resource family, was well cared for, and continued to thrive. Her resource parents also remained committed to adopting the child. On behalf of the Division, the DAG requested the court: (1) preserve the status quo with respect to Renee; (2) enjoin the biological parents from having any physical contact with Renee until the COVID-19 restrictions are lifted; (3) order the biological parents to submit to psychological evaluations; and (4) order defendant to submit to a psychiatric evaluation.

Defense counsel informed the judge defendant remained hopeful of reuniting with Renee after she was released from prison. Defendant addressed Judge Velazquez directly concerning the Integrity Program incident and claimed

the program was no longer available to her due the nature of her sentence. With respect to Renee, defendant noted she had not seen her for more than three months. She was happy the child was safe and "glad that she's with good people, but it's so not where she belongs, with her mom and dad."

Judge Velazquez granted the Division's application and entered a final permanency order to terminate the current Title 9 litigation. The judge found it was not in Renee's best interest to reunify with her biological parents and adopted the Law Guardian's proposed permanency plan of termination of parental rights followed by adoption by current resource parents.

III.

In New Jersey Department of Children & Families v. A.L., our Supreme Court made clear the terms "abuse" and "neglect" of a child in N.J.S.A. 9:6-8.21(c) refer to "a child less than 18 years of age[,]" not a fetus. 213 N.J. 1, 8, 20 (2013). The Court thus held: "If an expectant mother's drug use causes actual harm to the physical, mental, or emotional condition of a newborn child, a finding of abuse or neglect is appropriate." Id. at 8. Here, Judge Velazquez found the Division proved, by a preponderance of the evidence, defendant abused and neglected her newborn daughter by ingesting five to six bags of heroin on the day she gave birth, as well as by using opiates, benzodiazepines,

15

and cannabis throughout her pregnancy. Based on Dr. Razi's unrebutted testimony, Renee experienced severe drug withdrawal within a day of her birth. This physical and emotional manifestation of pain in newborn babies is known as neonatal abstinence syndrome.

The evidence presented by the Division proved beyond any doubt Renee was correctly diagnosed with neonatal abstinence syndrome two days after her birth. She was admitted to the NICU for three weeks where she was treated with morphine and placed in an environment devoid of stimulation. Hospital records documented Renee was very irritable; she had a high temperature and was unable to sleep or coordinate her feeding schedule; she was at times agitated and showed signs of tremors when awake. All these manifestations of physical distress and potential neurological trauma are directly attributable to defendant's use of heroin and other illicit drugs during her pregnancy.

N.J.S.A 9:6-8.21(c)(4)(b) defines child abuse or neglect to include "physical, mental, or emotional condition that has been impaired or is in imminent danger of becoming impaired as the result of the failure of his [or her] parent or guardian . . . to exercise a minimum degree of care . . . by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof . . . ." The Division can meet its burden of proof that a newborn has been abused and

16

neglected by presenting competent evidence that a child is suffering from withdrawal symptoms at birth. A.L., 213 N.J. at 22.

Defendant admitted she did not seek prenatal care nor participate in methadone treatment to address her drug addiction, and thereby did not negate or reduce the potential harm to her child at birth. Cf. N.J. Div. of Child Prot. & Permanency v. Y.N., 220 N.J. 165, 183 (2014) (holding a mother who participates in a physician-prescribed methadone treatment program does not, ipso facto, abuse her child at birth under Title 9, even if the baby is diagnosed with neonatal abstinence syndrome at birth). Stated differently, in sharp contrast to the uncontested facts here, the defendant in Y.N. "followed the advice of a medical professional and later entered into a methadone maintenance program." Id. at 184. The salient facts here are akin to the situation this court confronted in New Jersey Division of Child Protection & Permanency v. K.M., 444 N.J. Super. 325 (App. Div. 2016). In K.M., the defendant was addicted to opiates when she became pregnant. Id. at 327-28. Without consulting a physician, the defendant clandestinely used Suboxone -- a medication prescribed to ameliorate the symptoms of opiate withdrawal -- during her pregnancy. Id. at 328. We upheld a finding of abuse and neglect based on the defendant's intentional decision not to disclose her opiate addiction to the neonatal staff at the hospital

where she gave birth.  Id. at 331.  We held the defendant's decision to intentionally conceal her addiction caused her newborn infant to suffer the distress and pain of withdrawal over a three-day period.  Ibid.  The baby was subsequently diagnosed with neonatal abstinence syndrome.  Id. at 331-33.

The record developed by the Division at the fact-finding hearing amply supports Judge Velazquez's findings that defendant's drug use caused Renee to be born addicted to opiates and benzodiazepines.  Judge Velazquez accepted Dr. Razi's testimony and found Renee suffered serious withdrawal symptoms related to neonatal abstinence syndrome.  This conclusion is also supported by the documentary evidence admitted into evidence.  Renee was placed in the hospital's NICU for three weeks as a direct and proximate result of defendant's continued use of heroin and other illicit substances while pregnant.  Defendant's failure to take reasonable measures to address her drug addiction caused this child serious neurological harm.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3849-19