# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0498-17T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

    Plaintiff-Respondent,

v.

B.B.,

    Defendant-Appellant,

and J.R.,

    Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF B.R.,

    a Minor.

_____

Submitted April 3, 2019 – Decided May 15, 2019

Before Judges Accurso, Vernoia and Moynihan.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FG-13-0027-17.

Joseph E. Krakora, Public Defender, attorney for appellant (Catherine F. Reid, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason W. Rockwell, Assistant Attorney General, of counsel; Deirdre A. Carver and Joann M. Corsetto, Deputy Attorneys General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Joseph H. Ruiz, Designated Counsel, on the brief).

PER CURIAM

Defendant B.B. (Bill) appeals from a judgment of guardianship entered after a three-day trial terminating his parental rights to his daughter, B.R. (Beth) – who was born July 26, 2014 to her mother defendant J.R. (Jill)[1] – and awarding guardianship to the New Jersey Division of Child Protection and Permanency (the Division).[2] The trial court's conclusions are supported by competent

---

[1] Jill entered an identified surrender of her parental rights. She is not a part of this appeal.

[2] We utilize the pseudonyms for the parties and the child used in some of the merits briefs to protect their privacy, preserve the confidentiality of these proceedings, and for the reader's convenience. R. 1:38-3(e).

A-0498-17T4

evidence and the best interests of the child are served by termination of Bill's parental rights; thus, we affirm.

"Our review of a trial judge's decision to terminate parental rights is limited." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). We accord even greater deference to the judge's fact-finding "[b]ecause of the family courts' 'special jurisdiction and expertise in family matters.'" N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (alteration in original) (quoting Cesare, 154 N.J. at 413). We will not disturb the trial judge's factual findings unless they are "so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)).

"Where the issue to be decided is an 'alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom,' [this court] expand[s] the scope of . . . review." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188-89 (App. Div. 1993)). The trial judge's legal conclusions

A-0498-17T4

and the application of those conclusions to the facts are subject to plenary review. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

The Legislature has declared, as a matter of public policy, "[t]hat the preservation and strengthening of family life is a matter of public concern as being in the interests of the general welfare . . . ." N.J.S.A. 30:4C-1(a). Parental rights, however, are not inviolable. N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). "The balance between parental rights and the State's interest in the welfare of children is achieved through the best interests of the child standard." In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999). Before parental rights may be terminated, the Division must prove the following four prongs by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

A-0498-17T4

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a); see also A.W., 103 N.J. at 604-11.]

The standards "are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348.

Bill contends the trial judge misunderstood the legal test and burden of proof applicable to termination of parental rights cases, evidenced by several comments made by the judge. In assessing Bill's averment that the judge believed the Division had the burden only to prove that it was unsafe to return the child to Bill, we consider the context of the judge's statement:

[Bill's attorney] MS. NEWSHAM: But Your Honor, this witness [Dr. Brandwein] is being offered to say that this child will suffer harm, that's part of the fourth prong, that the harm to the child, terminating my client's rights will not be more harmful to the child. This witness through the Division is saying that –

THE COURT: Ms. Newsham, I don't think you understand. The Division doesn't have to prove that the

> current placement is the best and finest placement in the entire world. That's not their obligation.
>
> MS. NEWSHAM: I agree –
> THE COURT: All they have to prove is that it's unsafe to return the child to your client.
>
> MS. NEWSHAM: I understand that, Your Honor.

The judge was not commenting on the Division's overall burden. He was ruling on the Division's objection to Bill's counsel's use of the Division's expert in psychology, Dr. David Brandwein, "to render some kind of opinion on something we didn't ask him to evaluate" regarding the assessment of Bill's cousin, S.R., as a possible resource placement. Inasmuch as the fourth prong of N.J.S.A. 30:4C-15.1(a) requires balancing the potential future harm from retaining parental rights with the potential future harm from termination of those rights, the judge did not err in the limited context relating to that prong. See N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 108-10 (2008).

Defendant also contends the judge "misidentified the applicable burden of proof" at a pretrial conference[3] "when . . . the [judge] stated three times that

---

[3] As noted by the Law Guardian's merits brief, the citation to the May 18, 2017 transcript in Bill's merits brief is incorrect; there is no reference in the cited portions in that transcript. The statements appear in the June 27, 2017 trial transcript.

statutorily the burden of proof shifted and it was Bill's burden to prove that he should have 'custody' of Beth." The comments were made prior to the start of the trial when counsel and the judge were reviewing documentary evidence, including Bill's judgment of conviction for endangering the welfare of a child, N.J.S.A. 2C:24-4(a). In ruling the judgment of conviction was admissible, the judge said:

> Well, I think [the judgment of conviction] clearly has relevance and I don't see why, personally I have not found that the statute has been used to preclude supervised visitation, the reason being that if there's a burden shifting that doesn't mean the defendant can't prove that it would be safe and appropriate for him to have custody. It does shift the burden. But if you preclude visitation, supervised, then basically where do you get to a bonding situation, you've precluded the defendant from even coming forward with that information. And you know, I have not necessarily precluded supervised visitation as long as it's safe and appropriate. So I don't see that that's inconsistent. And I think it's admissible, all right.

The statute is not expressly mentioned in the transcript, but Bill suggests in his merits brief that it may be a burden-shifting statute found in Title Nine. From the context of the colloquy between the judge and both counsel, it is apparent they were discussing the impact the conviction would have on custody and visitation, not on termination of parental rights. In that N.J.S.A. 9:2-4.1(b) provides that a person convicted of endangering a child's welfare "shall not be

7

awarded the custody or visitation rights to any minor child, except upon a showing by clear and convincing evidence that it is in the best interest of the child for such custody or visitation rights to be awarded," the judge's statement did not conflate the burdens of proof. Bill's attempts to use out-of-context statements to show the judge misconstrued the law are gainsaid by the judge's oral opinion in which he correctly stated the burden: "I find that all four prongs have been met by clear and convincing evidence."

Bill also claims the judge erred in employing a "working backwards" analysis "from the starting point of a three-year-old girl, who had been with her foster parents for over two years." Bill urges that the proper analysis should have started with Beth's birth. We determine this argument is without sufficient merit to warrant discussion in this opinion. R. 2:11-39(e)(1)(E). The judge simply addressed Bill's defenses before analyzing the four statutory prongs. While we find that approach was unusual, it was not improper. We consider this appeal, not from the trial judge's reasoning, but from his ruling, which we will now examine. See N.J. Div. of Child Protect. & Permanency v. K.M., 444 N.J. Super. 325, 333-334 (App. Div. 2016) ("It is a long settled principle of appellate jurisprudence that 'an appeal is taken from a trial court's ruling rather than

reasons for the ruling.'" (quoting State v. Adubato, 420 N.J. Super. 167, 176 (App. Div. 2011))).

In determining if the Division met its burden with regard to the first prong, we consider "whether the parent has harmed the child or may harm the child in the foreseeable future." N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 113 (App Div. 2004) (citing A.W., 103 N.J. at 607). The Division "does not have to wait 'until a child is actually irreparably impaired by parental inattention or neglect'" to satisfy this prong. N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 449 (2012) (quoting In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999)). "Serious and lasting emotional and psychological harm to children as the result of action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights." In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992). "A parent's withdrawal of that solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." D.M.H., 161 N.J. at 379. "When the condition or behavior of a parent causes a risk of harm, such as impermanence of the child's home and living conditions, and the parent is unwilling or incapable of obtaining appropriate treatment for that condition, the

A-0498-17T4

first subpart of the statute has been proven." N.J. Div. of Youth & Family Servs. v. H.R., 431 N.J. Super. 212, 223 (App. Div. 2013).

From the time Bill was identified as Beth's father, he did not have a home suitable for his child. Except for times when he lived in a house which the Division caseworker described as "abandoned" and "unlivable" or lived with someone else in a rented room, Bill was homeless. He admitted to the Division adoption worker that he could not provide Beth with a home if he gained custody. In August 2015, he admitted to the Division caseworker that he was not ready to care for Beth.

Bill's drug use was uncontrolled. On August 7, 2015, Bill admitted marijuana use and that he missed a substance abuse evaluation appointment; he also tested positive for cocaine thirteen days later. In October 2015, he was non-compliant with his intensive outpatient program. He appeared under the influence at a November 2015 visitation and admitted he "did something" three days prior; a urine sample taken the same day tested positive for cocaine. Bill entered an intensive outpatient program at CPC Behavioral Healthcare (CPC), which reported his attendance was poor and he was noncompliant. On December 23, 2015, he self-reported to the Division that he tested positive during a random drug screen performed by his probation officer on December

21. A substance abuse evaluation in April 2016 recommended that Bill attend a long-term inpatient program. Instead, Bill entered and completed a twenty-one day short-term program at Bergen Pines. Bergen Pines recommended that Bill continue treatment at an intensive outpatient facility and he enrolled in CPC. He tested positive for marijuana in October 2016. And in April 2017, he tested positive for cocaine at CPC.

Dr. Brandwein, who was found to be a credible expert by the trial judge, conducted a psychological evaluation of Bill and concluded in his report that, the information he reviewed and his interview with Bill was

> indicative of a rather significant personality disorder in multiple realms that has a marked impact on [Bill's] cognition, affectivity, interpersonal relations, and impulse control. These disorders often respond poorly to conventional modes of mental health treatment due to the individual with the personality disorder not believing they are the problem and/or that any change is required of them. Rather, they tend to externalize blame and believe others need to change to fit their whims. As such, it is this examiner's opinion that [Bill] is highly unlikely to ever engage in Division services to the point where he would be able to receive a sufficient benefit from them to safely parent his daughter.

The doctor expressly opined "the prognosis for [Bill] to ever be a safe and appropriate parent for [Beth], on a scale of poor-fair-good-excellent, is poor."

A-0498-17T4

At trial, Dr. Brandwein diagnosed Bill with "a personality disorder . . . in the narcissistic histrionic antisocial and turbulent realm" with a secondary diagnosis of an "adjustment disorder." He also testified that people with Bill's disorders "don't take responsibility for their need to change. The world needs to change. Other people need to change." Dr. Brandwein concluded that Bill had difficulty meeting his own needs and therefore would have difficulty meeting Beth's needs. If placed with a person as unstable as Bill, the doctor testified that "[t]here would be a risk to the child's physical development, their emotional development, their intellectual development, really their development psycho[-]socially."

The evidence also established Bill's criminal involvement. The Division was informed of Bill's criminal history in June 2015: assault, domestic violence, child endangerment. On September 14, 2015 he was arrested for resisting arrest, trespass and hindering apprehension after he broke into Jill's home and was found hiding in the attic. Jill obtained a restraining order against him. Bill advised Dr. Brandwein that he was placed on probation for the endangering charge that stemmed from an incident when he slapped his former girlfriend's child for using a racial epithet.

A-0498-17T4

The trial judge found Bill was, both presently and for the foreseeable future, unable to perform the basic functions of a parent:

> He's still homeless. He hasn't complied with the drug treatment. And quite frankly, Dr. Brandwein's testimony and evaluation was very telling regarding his capabilities of parenting and he's just not there. He has some severe issues regarding personality issues. He has severe issues in his background regarding domestic violence and criminal [behavior].

And the judge noted Bill's admission that he was not in a position to care for Beth. The evidence thus supported the trial judge's finding that the Division met its burden with regard to the first prong. See H.R., 431 N.J. Super. at 223.

It is common that the proofs relating to the first and second prongs dovetail. N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006). The proofs common to the first two prongs in this case support the judge's findings regarding the second prong which requires the Division to "demonstrate that the parent is 'unable to eliminate the harm facing the child or is unable . . . to provide a safe and stable home for the child' . . . before any delay in permanent placement becomes a harm in and of itself." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 434 (App. Div. 2002) (first alteration in original) (quoting N.J.S.A. 30:4C-15.1(a)(2)). The second prong may be met by showing "that the parent is unable to provide a safe

and stable home for the child and that the delay in securing permanency continues or adds to the child's harm," or "that the child will suffer substantially from a lack of stability and a permanent placement and from the disruption of her bond with foster parents." K.H.O., 161 N.J. at 348-349, 363.

Bill never obtained stable, appropriate housing for Beth. See K.H.O., 161 N.J. at 348-349, 363. He consistently relapsed during his failed drug treatment efforts. The instability, together with the cluster B personality traits – "[d]ramatic, erratic and emotional" – that Dr. Brandwein diagnosed in Bill, which the doctor said was "very, very ingrained in people that have them," led the doctor to find "there was a lack of evidence that [the] behavior that led to the instability was going to change." The doctor concluded that he "did not deem [Bill] to be able to be an independent caregiver" at the time of Bill's evaluation and opined that Bill would not be able to be a caregiver "in the foreseeable future."

"[T]he second prong may be met by indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, the inability to provide a stable and protective home, the withholding of parental attention and care . . . with the resultant neglect and lack of nurture for the child." K.H.O., 161 N.J. at 353. What most concerned the A.W. Court was the lack of

evidence of "any realistic likelihood that the parents would ever be capable of caring for the children." 103 N.J. at 614. Even when parents are not blameworthy, parental unfitness can be established when their behavior "indicates a further likelihood of harm to the child in the future." Id. at 615-16.

The trial judge properly considered evidence that Bill was unable to correct his "conduct within the reasonably foreseeable future." N.J. Div. of Child Protect. & Permanency v. T.D., 454 N.J. Super. 353, 380 (App. Div. 2018). That evidence proved that the harm to Beth would continue because Bill was unable or unwilling to overcome or remove it, thus satisfying the second prong. N.J. Div. of Child Protect. & Permanency v. P.P., 180 N.J. 494, 506-07 (2004).

Bill's inability to remove the harm to Beth resulted in the formation of a bond between the child and her resource parents which Dr. Brandwein said represented Beth's "primary parental attachments, and that the resource parents are [Beth's] psychological parents." Dr. Brandwein also noted that breaking the bond between the child and the resource parents, because she had been with them since she was ten months old, "would be separating her from her first bond . . . [which] has the potential to be highly detrimental to a child. . . . [The child] would psychologically be lost and [it would] be very, very difficult for her to

recover from that." This evidence supported the judge's conclusion that the Division proved the second prong. See N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 592 (App. Div. 1996) (recognizing "harms attributable to a biological parent include the prolonged inattention to a child's needs, which encourages the development of a stronger, 'bonding relationship' to foster parents, 'the severing of which would cause profound harm'" (quoting In re Guardianship of J.C., 129 N.J. 1, 18 (1992))). As our Supreme Court held in K.H.O., 161 N.J. at 348-49, harm may be "shown [by proof that] the parent is unable to provide a safe and stable home for the child and that the delay in securing permanency continues or adds to the child's harm."

Bill's third-prong challenge avers: the trial judge's conclusory finding that the Division made reasonable efforts to provide services was not supported by the record; the Division delayed in confirming his paternity; it also failed "in planning with Bill for the care of his child"; and its "delay in processing S.R. was unreasonable."

In ruling the Division provided reasonable services to Bill, the trial judge observed that, despite receiving extensions while the case was on the FN docket to achieve reunification with Beth, he "never complied with services." Notwithstanding the trial judge's perfunctory finding regarding the services

16

provided to Bill by the Division, the record supports that reasonable services were offered.

The Division arranged for visitation, transportation, substance abuse evaluations and treatment; Bill was also working with social services to obtain housing. Although he attended most supervised visitation sessions, Bill was unavailable on at least eight occasions. In 2015, Bill: was unreachable when the Division attempted to contact him to schedule visitation in July; failed to appear for a confirmed visitation in August; failed to confirm another visit in August, resulting in a cancellation; was unable to attend visits until they resumed in September because of his incarceration; and failed to confirm two visits in December, resulting in more cancellations. He also cancelled two visits in January 2016, one while Beth was en route. And, as noted, he failed to remain sober or provide a home suitable for Beth.

We do not measure the reasonableness of the Division's efforts by their success. D.M.H., 161 N.J. at 393. In light of all the circumstances in this case, the record supports that the Division made "[c]onsistent efforts to maintain and support the parent-child bond" thus satisfying its obligation. Ibid.

Bill argues the Division's delay in confirming his paternity "was completely antithetical" to its obligations under the third statutory prong. The

trial judge observed that "it would have been better if the Division got [Bill] involved earlier" but concluded "[t]he bottom line is though he has been involved with the Division now for almost two and a half years[,]" he was still homeless and noncompliant with drug treatment. We review the circumstances surrounding the delay in confirming Bill's paternity.

Bill contends in his merits brief that he contacted the Division in February 2014, prior to Beth's birth, and warned that Jill was abusing drugs while pregnant with what he believed to be his child. The record to which he refers to buttress this contention, however, make no mention that he disclosed his belief that he was the father.

It was not until three days after Beth was born that Bill called the Division and requested a paternity test because "the baby was supposedly his but [Jill] cheated on him." Indeed, the Division caseworker reported that during her hospital visit with Jill on July 28, 2014, Jill told the caseworker she was not sure who the father was and, in fact, registered under a name other than her own, because "she did not want to deal with the 'drama' from the father." A man visiting Jill during the caseworker's call told the caseworker he was not sure if he was the father. Jill, nonetheless, refused to name the father.

A-0498-17T4

On August 1, 2014, under an FN docket, a different judge ordered Jill to "provide the name and whereabouts of the child's biological father so that a paternity test may be completed" and the Division to offer genetic testing to any putative father, including Bill. On August 29, Jill disclosed that Beth's father was either her male hospital visitor or Bill.

Though the Division caseworker said he had frequent conversations with Bill from July 2014 until June 2015, the Division maintained in March 2015 that Jill "did name two fathers for [Beth] and a search has been put out for them." It is perplexing that the Division was still searching for someone with whom they had contact or why the Division did not arrange a paternity test for Bill. It is also not clear why Bill did not appear for the first scheduled paternity test in May 2015. Both he and the male hospital visitor were tested on June 2, 2015. The Division was notified Bill was the father on June 15, 2015.

Although we look askance at the Division's seemingly dilatory response to the court's order to have Bill tested, and the lacuna in the court's enforcement of its order, we recognize that Jill's refusal to identify Beth's father initially delayed this process. We also note that during the pendency of the paternity investigation, on July 15, 2015, Bill was named as a defendant in the FN case and that judge found good cause to extend the FN case because of Bill's recent

identification as the father; he was allowed supervised visitation which continued pursuant to the court's August 25 FN order. In an effort at reunification, the court granted another extension on October 22, 2015, remarking Bill was "working with social services to obtain stable housing and working on services." The order mandated that Bill notify the Division when he enrolled in drug treatment at CPC and maintain weekly contact with the Division caseworker and that the Division continue to provide Bill with supervised visitation and bus passes.

As we have already detailed, Bill did not take advantage of the services provided by the Division. His continued drug use was recorded in the court's January 19, 2016 FN order, as was the Division's provision of "visitation, evaluations and referrals for service." The court, however, found that termination of parental rights was then inappropriate and gave Bill "more time to work toward progress in addressing his issues"; another extension was granted. Three months later, the court entered an almost identical order. Bill was also ordered to submit to a hair follicle test and follow recommendations after a substance abuse evaluation; the latter mandate was also ordered on July 12, 2016. Visitation was continued in both the April and July 2016 orders.

A-0498-17T4

Despite the extensive services offered for over two years after Bill was identified as Beth's father in June 2015, both under the FN and FG dockets, he was still unable to parent Beth. While we do not condone the delay between July 2014 and June 2015 in identifying him as the father, that delay did not result in Bill's inability to parent considering the services the Division offered and the efforts made by the Division and the court to reunify Bill with his daughter. The record supports the finding that the Division provided reasonable services as defined in N.J.S.A. 30:4C-15.1(c).

Turning to the second part of the third prong – requiring the Division to establish that alternatives to termination have been considered – Bill contends the Division's delay in considering his proposal that S.R. serve as Beth's resource parent contravened its statutory obligation to "initiate a search for relatives who may be willing and able to provide the care and support required by the child." N.J.S.A. 30:4C-12.1(a). He argues the Division, in compliance with that statute, should have initiated a search for paternal relatives within thirty days after it took custody of Beth or, at the latest, within thirty days after Bill's paternity was confirmed.

As Bill's alternative argument anticipates, we perceive no merit in the former contention. Jill named two putative fathers. Until paternity was

21

confirmed, it was not reasonable for the Division to investigate relatives of someone who may not be Beth's father. As to Bill's latter assertion, the court's July 15, 2015 order, following confirmation of Bill's paternity, required him to provide the names of possible resource parents and the Division to investigate those persons. He provided S.R.'s name to the Division in early August. The Division caseworker contacted S.R. and obtained identifying information for everyone in her household and ran background checks. On September 11, 2015, the Division received the results of an inquiry to the Maplewood Police Department regarding S.R. which revealed S.R. did not have a criminal record but her son had "some juvenile criminal history and possible mental health concerns."

Despite the entry of an October 22, 2015 court order requiring the Division to evaluate S.R. as a resource for Beth, there is no evidence in the record that anything was done after the September 2015 background check through March 2016, when the file was turned over to a new caseworker who had to complete a relative resource care packet (packet) and send it to the Division's Resource Unit in order for S.R.'s home to be licensed – a prerequisite for Beth to live in that home. In April 2016, the court entered another order compelling the Division to investigate parental relatives. The new caseworker

22

started the packet in April and submitted it to the Resource Unit in June 2016. During a meeting on April 26, 2016, S.R. told the new caseworker that she would be willing to be a resource parent for Beth and complete PRIDE[4] training. S.R. testified that a Division resource worker – whom S.R. described as "my guide through step by step to get to where I needed to be, to finish my classes, any training and having my home inspection" – then contacted her and provided the contact information to set up S.R.'s required classes. S.R. also testified that the home-licensing process began in May 2016. She admitted there was a licensing delay after her home failed inspection in March because of a water-temperature problem, but a license was issued in April 2017.

We, again, see no reason for the six-month period of inaction between completion of the background check in September 2015 and the commencement of the preparation of the packet. But we cannot characterize that delay as the Division's embarkation "on a course set for termination of parental rights and adoption by a foster parent without at least first exploring available relative placements," a practice which we decried in New Jersey Division of Youth and

---

[4] PRIDE is an acronym that stands for the Parental Resources for Information, Development and Education training program provided by the Division. Department of Children and Families, Training (PRIDE) (May 6, 2019 5:24 p.m.), https://www.nj.gov/njfosteradopt/services/training/; see N.J.A.C. 3A:51-5.6(a)(1).

Family Services v. J.S., 433 N.J. Super. 69, 81 (App. Div. 2013) (quoting N.J. Div. of Youth & Family Servs. v. K.L.W., 419 N.J. Super. 568, 580 (App. Div. 2011)). The Division's actions fairly met the "important objective of the statutory scheme[: the] 'prompt identification of relatives and notice to them of the results of the investigation and the potential for termination if the child remains in foster care.'"[5] Ibid. (quoting K.L.W., 419 N.J. Super. at 580).

Although the Division could have been more diligent in investigating S.R. during that six-month period, we discern other issues delayed the process: concerns about marijuana use and fighting by her son who was still living in the home and the regulation of the water temperature. We also observe the Division apprised S.R. that Beth was in adoption status; nonetheless, S.R. was afforded visitation with Beth and the Division had to arrange to transport Beth during evening and weekend hours because S.R. could not accommodate regular visitation hours due to her work schedule.

In J.S., we held the Division is required to promptly "conduct a fair investigation" of any identified relative:

> The Division cannot ignore such a relative's timely
> application out of bureaucratic inertia, or consider that

---

[5] We note that the only relative proposed by Jill was a maternal grandmother whose paramour refused to comply with the Division's licensing requirements and was therefore ruled out in August 2014.

A-0498-17T4

application based upon an arbitrary, preordained preference for the foster placement. The Division must perform a reasonable investigation of such relatives that is fair, but also sensitive to the passage of time and the child's critical need for finality and permanency. If, hypothetically, the Division has been lax or capricious in its assessment of such timely-presented alternative caretakers, it bears the litigation risk that a Family Part judge will conclude, under N.J.S.A. 30:4C-15.1(a)(3), that it has failed to prove by clear and convincing evidence that "alternatives to termination of parental rights" have been appropriately considered.

[433 N.J. Super at 87.]

This was not the case where the Division failed to investigate a timely-disclosed relative. Bill failed to mention his cousin as a potential resource until thirteen months after Beth was born, and S.R. was not even aware Beth had been born until then. Nor did the Division consider S.R. based on "an arbitrary, preordained preference for foster placement" as evidenced by the provision of visitation and the considerable attention the Division paid to S.R.'s application for most of the time it was pending. Ibid.

To be sure, "alternatives to termination of parental rights were considered" as required by N.J.S.A. 30:4C-15.1(a)(3). The Division conducted an emergency removal of Beth from the hospital right after her birth because of Jill's drug use and concerns about her mental health; Jill's refusal to name Beth's father prevented the Division from considering paternal relatives and caused

Beth's placement with a resource parent. She was placed with her present resource parents when she was ten-months old – before Bill identified S.R. – because Bill could not parent her. As Beth approached her third birthday, she had been with her present resource parents for over two years. The Division sent a rule-out letter to S.R. advising her: "it is in [Beth's] best interest not to be placed in [S.R.'s] home. [Beth] has been in her current home since she was [ten] months old and it has been determined by a psychologist that removal from this home would be detrimental to [Beth]."

N.J.S.A. 30:4C-12.1, in addition to requiring the Division to search for and assess relatives after it accepts a child in its custody, allows the Division "to pursue the termination of parental rights if [it] determines the termination of parental rights is in the child's best interests." N.J.S.A. 30:4C-12.1(c). According deference to the Division's interpretation of the "best interests" language in the statute, we determined the statute did not create a "presumption in favor of placing children with competent and willing relatives. . . . The reality is that, no matter how fit or willing a proposed relative may be, a child will, in some instances, be better off remaining in a successful foster placement." J.S., 433 N.J. Super. at 85.

The record supports that determination. As we already noted, Dr. Brandwein opined that breaking the bond between Beth and the foster parents, with whom she had been since she was ten months old, "would be separating her from her first bond . . . [which] has the potential to be highly detrimental to a child. . . . [The child] would psychologically be lost and [it would] be very, very difficult for her to recover from that." There is no evidence that Beth developed a long-standing relationship with S.R. over the course of visitations provided. Inasmuch as "there is no legal presumption in favor of a child's placement with relatives," J.S., 433 N.J. Super. at 88, and Bill was not in any position to parent Beth, there is no evidence to controvert Dr. Brandwein's opinion, as adopted by the trial judge, that it was in Beth's interests to remain with her resource parents.

We do not perceive that the delay attributable to the Division contributed in any appreciable way to an increased bond between Beth and her resource parents or a lessening of a relationship with S.R., who was not licensed for about ten months after her packet was completed. Even if the investigation was completed six months earlier, Beth would have been with her present resource parents for eighteen of her twenty-eight months. The trial judge credited Dr. Brandwein's

> position that removing this child from the only home
> that [Beth] could possibly remember or know, I mean

27

been there since she was nine or [ten] months old, basically for the last almost three years, the child's whole life has been with these caretakers. To expect, to argue that they are securely bonded, particularly at this age, the child is over three, and that time two and a half, or a little over, I mean it shouldn't be any surprise. And to disrupt that child and take it away from the only placement and put it with a stranger who saw the child four or five visits. The Division's rule out for best interest seems extremely reasonable. This isn't a capricious argument. This isn't something that was done on a whim. This was done based on first of all just the facts of the case. That this child had been there for several years and it's the only home the child knows.

We thus see ample reason for the trial judge to uphold the Division's decision to rule out S.R. And, as stated, the Division did not eschew its responsibility to conduct a fair investigation of S.R. even though it ruled her out. J.S., 433 N.J. Super. at 87.

We pause to address the trial judge's descriptions of Bill's argument regarding the Division's consideration of S.R. as a "red herring." Those comments were unfortunate because they may be construed to mean that the judge ignored the statutory obligation to consider alternatives to termination as part of the Family Part's analysis under the third prong of the best-interests standard, N.J.S.A. 30:4C-15.1(a)(3); H.R., 431 N.J. Super. at 226, or to assess the Division's rule-out determination which is always subject to "the Family Part's ultimate assessment of that child's best interests," J.S., 433 N.J. Super. at

Notwithstanding the judge's "red herring" reference, he did, as we have observed, consider the Division's proofs regarding alternatives to termination and its reasons for ruling out S.R.

The Division satisfied the fourth prong through Dr. Brandwein, who, the evidence proves, was "'a well qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation' of the child's relationship with both [her natural parent] and her foster parents." M.M., 189 N.J. at 281 (quoting J.C., 129 N.J. at 19). Finding Dr. Brandwein's testimony credible, the trial judge evaluated the strength of Beth's relationship to Bill and the resource parents, the relative harm that would befall Beth if she was removed from one or the other and the ability of each to ameliorate that harm. See K.H.O., 161 N.J. at 355. The judge found compelling the strength of the bond between Beth and the resource parents and the parents' ability to ameliorate any harm caused by the termination of Beth's thin bond with Bill, who admits in his merits brief that he never intended to be her custodial parent. The judge's decision was amply supported by Dr. Brandwein's testimony and recognized that "a child has a right to live in a stable, nurturing environment and to have the psychological security that his most deeply formed attachments will not be shattered." F.M., 211 N.J. at 453.

A-0498-17T4

We determine the balance of Bill's other arguments are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-39(e)(1)(E).

After a careful consideration of the record, we affirm.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0498-17T4